NOT FOR PUBLICATION [15,16]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

WEST WINDSOR-PLAINSBORO REGIONAL    :
SCHOOL DISTRICT, BOARD OF EDUCATION, :
                                    :
                   Plaintiff,       :        Civil Action No.: 09-cv-4326
                                    :                **OPINION**
v.                                  :
                                    :
M.F. and M.F. o/b/o A.F.,           :
                                    :
                   Defendants,      :
_____:

**<u>WOLFSON, United States District Judge</u>**

  Presently before the Court are Cross- Motions for Summary Judgment by Plaintiff West

Windsor-Plainsboro Regional School District Board of Education ("Plaintiff" or "District") and

Defendants M.F. ("Mrs. F") and M.F. ("Mr. F."),(collectively referred to as "Parents" or

"Defendants") the parents of A.F., a child classified as eligible for special education services by

the District.  The instant motions arise out of the District's appeal of a decision by

Administrative Law Judge ("ALJ") Patricia M. Kerins holding that the District did not provide

A.F. with a free appropriate public education ("FAPE") in accordance with the Individuals with

Disabilities Education Act ("IDEA") for the school years 2007-08 and 2008-09, and that a

supplemental home-based Applied Behavioral Analysis ("ABA") program provided to A.F. at

the Parents' own expense was appropriate.  In her decision, ALJ Kerins also found that the

Parents were entitled to reimbursement for the costs and expenses they incurred in providing the

supplemental home  program to A.F. for the 2007-08, 2008-09 and 2009-10 school years.  The

1

District now appeals that decision.  This Court has jurisdiction pursuant to 20 U.S.C. §1415(i)(2)(A).  For the reasons set forth below, the Court affirms the ALJ's decision.

## I.    BACKGROUND

### A.  Individuals With Disabilities Education Act, 20 U.S.C. 1400 et seq.

Through the IDEA , 20 U.S.C. §1400, et seq., the federal government provides funding to assist states in educating handicapped children living within their borders.  Bd. of Educ. of the Hendrick Hudson Cent. Schl. Dist. v. Rowley, 458 U.S. 176, 73 L. Ed. 2d 690, 102 S. Ct. 3034 (1982)).  Among the IDEA's purposes is "assuring that all handicapped children have available to them a free and appropriate public education  which emphasizes special education and related services designed to meet their unique needs." L.P. v. Edison Bd. of Educ., 265 N.J. Super. 266, 272, 626 A.2d 473 (Law Div. 1993) (citing 20 U.S.C. §1400(c)).  The IDEA realizes this aim by imposing a series of goals and procedures on participating states.  See Bd. of Educ. of the Pawling Cent. Schl. Dist. v. Schutz, 290 F.3d 476, 481 (2d Cir. 2002); L.P., 265 N.J. Super. at 272-73 (describing requirements of 20 U.S.C. §§1412 and 1413).

Chief among a participating state's duties is that of creating an Individualized Education Plan ("IEP") for each disabled student within the state's school system.  Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 756 (3d. Cir. 1995); see L.P., 265 N.J. Super. at 272-73 (citing 20 U.S.C. §1414(d)).  In New Jersey, this duty can be assumed by a local educational agency ("LEA"), such as the District.  See N.J.S.A. 18A: 46-5.1; L.P., 265 N.J. Super. at 273 (citing N.J.S.A. 18A: 46-8).  The IEP is a written statement developed by a team comprised of the disabled student's parents, at least one of his or her teachers, and other local educational agency employees.  20 U.S.C. §1414(d)(1)(B).  It includes, among other things, a statement of the student's present

2

educational performance, measurable annual and shorter-term goals, and the services to be provided to the child.  20 U.S.C. §1414(d)(1)(A).

The IDEA grants parents who disagree with the LEA's proposed IEP the right to challenge the IEP in a "due process" hearing via the state's administrative law process.  Schutz, 290 F.3d at 481 (internal citations omitted) (citing Honig v. Doe, 484 U.S. 305, 311-12 (1988)); L.P., 265 N.J. Super. at 273-74.  In New Jersey, this process entails filing a complaint and request for a hearing with the New Jersey Department of Education.  See generally L.P., 265 N.J. Super. at 273-74; N.J.A.C. 6A: 14-2.7(c).  New Jersey has further designated its Office of Administrative Law ("OAL") to hear the special education complaints filed with the Department. L.P., 265 N.J. Super. at 274.  The dispute is adjudicated by an ALJ  who has authority under the IDEA and New Jersey law to deem the LEA's proposed IEP inappropriate.  See id.; N.J.A.C. 6A: 14-2.7(n)-(o).  The ALJ's decision on "the appropriateness of the IEP is final and binding on the parties and must be implemented without undue delay."  L.P., 265 N.J. Super. at 274; N.J.A.C. 6A: 14-2.7(g).  Aggrieved parties may appeal the ALJ's decision to a state or federal district court.  20 U.S.C. §1415(i)(2).

Traditionally, the burden of proof to demonstrate compliance with IDEA had been upon the school district.  The parents needed only place the appropriateness of the IEP at issue, and the burden would then shift to the school district to prove that the IEP was indeed appropriate.  In 2005, however, the Supreme Court changed the burden analysis.  See Schaffer v. Weast, 546 U.S. 49 (2005) ("burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief").  Following the Supreme Court's holding in Schaffer, the Third Circuit has held that "appellants bear the burden of proof when challenging the

appropriateness of the relevant IEPs." L.E. v. Ramsey Bd. of Ed., 435 F.3d 384, 392 (3d Cir. 2006) (citing Schaffer, 546 U.S. 49, 126 S.Ct. at 537).  Subsequent to the Schaffer and Ramsey decisions, New Jersey enacted legislation placing the burden of demonstrating the appropriateness of an IEP upon the school district.  N.J.S.A. 18A:46-1.1. (2008); see also R.S. v. Somerville Bd. Of Educ., Civ. A. No. 10-4215, 2011 WL 32521, at *7 n.7 (D.N.J. Jan. 5, 2011).

In a situation where a child has been unilaterally placed by his or her parents in an educational setting contrary to the IEP, the parents may be entitled to reimbursement, only if the program proposed in the IEP was inappropriate "and if the parents demonstrate they have acted in good faith."  Lascari, 560 A.2d at 1191; see also 20 U.S.C. §1412(a)(10)(C)(ii).  The focus of the court's inquiry is to evaluate the appropriateness of "the IEP actually offered and not one that the school board could have provided if it had been so inclined."  Lascari, 560 A.2d at 1189.

### B.  Factual Background[1]

A.F. is a seventeen-year-old boy who has been diagnosed with autism.  Vol. 2, R-2 at AR 3; Vol. 2, R-5, at AR 16-18; Vol. 2, R-9, at AR 40.  At all times relevant to this action, A.F. has resided with his mother, M.F., sister and maternal grandmother in West Windsor, New Jersey. Vol. 2, R-2, at AR 3; Vol. 16, Tr. 133:10-134:19; Vol. 10, Tr. 75:6-17.  A.F. came to the District at the age of nine, during the 2003-04 school year, whereupon A.F. was given a comprehensive evaluation by the District.[2]  See generally Vol. 2, R-5 at AR 16; Vol. 2, R-6 at AR 19; Vol. 2, R-

---

[1]    Much of the testimony and documentary evidence in the administrative record concerns the appropriateness of the District's proposed placement in the LARKS program -- an issue no longer in the case.  Considering the limited nature of the issues before this Court, the Court need not summarize the entirety of each witness' testimony.  Rather, the Court will focus on the evidence relevant to the reimbursement issues presented in this appeal.

[2]    The evaluations included a neurological evaluation by Dr. Gabor Barabas, M.D., a psychological evaluation by Judith Hanna, school psychologist, and a social work assessment by Carla Parreott, school social worker.  Additionally, A.F. was given a language/learning evaluation

7 at AR 23; Vol. 2, R-8, at AR 32-35; Vol. 2, R-9 at AR 40; Vol. 10, Tr. 77-85.  As a result, A.F. was, and has been at all relevant times, classified as eligible for, and entitled to, special education and related services under the category of "autistic" from the District.[3]  The District initially proposed to place A.F. at the Reed Program at Mercer County Special Services School, however, A.F.'s parents disagreed with this placement and obtained counsel.  Ultimately the parties agreed on a placement at the Children's Center of Monmouth County ("CCMC").  See Vol. 2, at AR 40; Vol. 10, Tr. 136:1-13.

        CCMC is a school approved by the New Jersey Department of Education as a private school for the disabled.  The school offers educational programs and related services for students with autism and multiple disabilities between the ages of 3 and 21.  See Vol. 4, P-3, at AR 422. A.F. began at CCMC in February 2004 and remained there for the entire period at issue in this case.  Following his placement at CCMC, A.F.'s parents gave notice to the District that they had obtained private consultants at their own expense to provide A.F. with a supplemental home-based program based upon the principles of ABA.  Vol. 16, Tr. 135:6-136:19; 143:8-144:4; 145:11-19.

        In the spring of 2007, A.F. was re-evaluated as mandated by the IDEA.  The evaluations consisted of an updated social history as well as a re-evaluation by Anne Holmes and Nina Finkler from the Eden Institute, the professionals who had evaluated him in 2003.  AR 3-11; Vol. 10, Tr. 87-92, 96-103.  In the social history, Mrs. F. reported that A.F. had made progress in his placement at CCMC, but that A.F. also benefitted from the supplemental home program which

by Anne Holmes, Nina Finkler and Courtney Guadagno from the Outreach and Support Services of Eden Institute.

[3]        A.F.'s classification as autistic and his eligibility for special education and related services is not disputed by either party.  See Vol. 10, Tr. 83-85, 92-93, 96, 103-104

provides additional therapy three to four times each week for one and a half to two hours.  AR 4.

The Eden evaluators reported that A.F. had made progress since 2003 and that A.F. thrived on

"teaching approaches that are well grounded in Applied Behavior Analysis ("ABA").   AR 10.

The Eden evaluators also noted that A.F. had significant difficulties with

articulation/intelligibility and recommended a voice output communication system evaluation.

Vol. 2, R-3 at AR 11.  Subsequently, an Augmentative and Alternative Communication

Evaluation was performed as part of the re-evaluation by Amy Doughtery, who recommended a

trial with a voice output communication system known as a Dynavox Mini Mo.  Vol. 2, R-4 at

AR 12-15.  In a trial at Ms. Doughtery's office, A.F. quickly learned to use the system and

appeared to enjoy using it to communicate.  Id. at AR 14.  Thereafter, the District purchased a

Dynavox system for A.F. who used it successfully at CCMC.  Vol. 10, Tr. 89-92; Vol. 12, Tr. 48.

On May 24, 2007, a meeting was held to develop an IEP for the 2007-08 school year.

The meeting participants included  Mrs. F, A.F.'s case manager Leslie Wyers ("Wyers"), recent

evaluators Holmes and Quinlan and A.F.'s teacher Beth Graja; in addition, CCMC therapists

participated via conference call.  Mrs. F. was also accompanied by her attorney, Beth Callahan,

and their consultant, Dr. Breslin.  The District's attorney, David W. Carroll and a supervisor of

special services, Kathy Mitchell, were also in attendance.  Vol. 10, Tr. 92-93; Vol. 2, R-9 at AR

40.  All the participants agreed that A.F. continued to be eligible for special education and related

services under the autistic category.  Id.; Vol. 10, Tr. 92-93, 96, 103-104.  At the meeting, A.F.'s

CCMC teacher, speech therapist and occupational therapist went over their assessments of A.F.'s

then-current academic and functional levels.  Vol. 10, Tr. 104-108; Vol. 2, R-10, at AR 45-47,

AR 65-67.  The parents' attorney, Callahan, also presented a document she had prepared entitled

6

"Parental Input." Vol. 2, R-10 at AR 47; Vol. 10, Tr. 108-109. This document claimed that A.F. had made "minimal educational progress" at CCMC and that A.F.'s academic gains resulted from the supplemental ABA-based home program and not the program provided at CCMC. Vol. 2, R-10 at AR 47. Additionally, the document set forth the parents' view that A.F.'s 2007-08 IEP had to incorporate intensive "home program services based upon the science and principals [sic] of Applied Behavior Analysis." Id.

Several placement options were discussed at the May 24, 2007 meeting, including: (1) continuing the current placement at CCMC; (2) placement in the ACES program, an in-district autistic program at the Middle School, recommended by Anne Holmes; and (3) other out-of-district placements. Vol. 10, Tr. 109-114. The District recommended the ACES program, an in-district special needs program, while A.F.'s parents sought placement in a full time ABA program.[4] Vol. 2, R-14 at AR 120; Vol. 16, Tr. 140:15-141:25. Ultimately, the parties compromised and agreed to continue the CCMC placement for the summer months[5] while investigating other options. Vol. 2, R-10, at AR 55; Vol. 10, Tr. 114-116, 120-121. Specifically, the District agreed to investigate and send records to four out-of-district full-day ABA programs suggested by A.F.'s parents and Dr. Breslin – Somerset Hills, Princeton Child Development Institute ("PCDI"), Alpine and Garden Academy. See Vol. 2, R-10 at AR 55. A.F.'s parents also agreed to consider the in-district program. Id.; Vol. 10, Tr. 114, 116. The District's witness, Wyers, testified that following the meeting, she contacted each of the placements requested by

---

[4]     Because both the District and Parents were seeking placements other than CCMC following the 2006-07 school year, the Parents allege that neither they nor the District believed that CCMC was the appropriate placement for A.F. See Defs.' Br. at 11.

[5]     All of A.F.'s IEP have included an extended school year ("ESY") program over the summer months.

A.F.'s parents, however, the programs either did not have openings or did not serve A.F.'s age group.  Vol. 10, Tr. 127-128.

In August 2007, the District and A.F.'s parents met again, without counsel present.  At this meeting, the District proposed its in-district LARKS program, as opposed to the ACES program, in order to minimize A.F.'s transitions.[6]  See Vol. 10 Tr. 128-132.  A.F.'s parents asked for time to consider the proposal.  Ultimately, A.F.'s parents decided to continue with the CCMC placement pending an opportunity to send a specialist to observe the LARKS program.  Vol. 2, R-14, at AR 144.  Additionally, the District denied the Parents' request to fund the supplemental home program, stating:

> The district believes that A. has achieved educational benefit from his day placement and that, though home services were offered as part of his program (both monthly visits as well as a Home Training Assessment) neither have been utilized by you.  The Current proposed IEP includes extensive home consultative services to assist A.'s family in helping him generalize his learning experience at school within his home and community.  [Vol. 5, P-16, at AR 789]

Accordingly, A.F. remained at CCMC during the 2007-08 school year under the August 2007 IEP, (R-14, Vol. 2, AR 116), while Defendants further continued to provide A.F. with a home program at their own expense.  Vol. 2, R-9 through R-14, at AR 40-116.

Although A.F.'s parents had previously declined home services from CCMC, A.F.'s 2007-08 IEP included home programming services, different from those that A.F.'s parents provided at their expense.  Vol. 2, R-14 at AR 149.  Specifically, unlike the ABA-based home program provided by A.F.'s parents,  the 2007-2008 IEP provided for a monthly one-hour home visit by CCMC staff and Home Training Assessments as necessary by CCMC outreach services.

---

[6]     Under the District's initial proposal, A.F. would only be in the ACES program in the Middle School for one year after which he would have to transition to the LARKS program in the high school.

<u>Id</u>.  In October 2007, Lynn Chodos, the Outreach Supervisor at CCMC, performed a home needs assessment of A.F.  Vol. 3, R-17 at AR 246-248.  Chodos recommended increased coordination between school and home, such as a weekly communication sheet.  Wyers followed up with Graja, A.F.'s CCMC teacher, who informed Wyers that a daily communications book between A.F.'s home and school was already being used.  Vol. 11, Tr. 139-140.  As for A.F.'s private home therapist, Wyers claimed that she had tried to get contact information but was denied, nor was she informed that the therapist had changed.  Vol. 11, Tr. 140.

In November 2007, the Parents' expert Dr. Breslin observed the District's LARKS program but issued no report.  Vol. 13, Tr. 213.  Although the District attempted to discuss a possible transition to the LARKS program during the school year, no meetings occurred.  Vol. 10, Tr. 135-141.  Accordingly, A.F. completed the entire 2007-2008 school year at CCMC.

Another IEP meeting was held in May of 2008 to discuss A.F.'s program for the 2008-09 school year.  The District again proposed placement in the LARKS program, <u>see</u> Vol. 3, R-16 at AR 199, while A.F.'s parents sought placement in a full-time ABA program that would provide 35 to 40 hours a week of instruction.  Vol. 16, Tr. 149:18-156:7.  No agreement as to placement was reached at this first meeting.  In June 2008, Mrs. F. visited the LARKS program with two of her experts -- Dara Monsorno and Carrie Magaletta – but provided no reports or feedback to the District at that time.[7]  Another IEP meeting took place on June 18, 2008, which A.F.'s parents did not attend, and after which the District finalized its proposed IEP for 2008-09.  R-16 at AR

_____

[7]     While the District was not provided with any reports or feedback while the various IEPs were being developed, ultimately Defendants did submit reports to the District on October 8, 2008.  However, this was after the IEP meetings were held and the school year had begun,  and just eight days before the hearings were scheduled to begin.  Vol. 14, Tr. 124; Vol 18, Tr. 66.

199.   Defendants did not agree with the District's proposed placement at LARKS and, on June 20, 2008, filed a request for a hearing with the Office of Special Education ("OSEP") on the issue of placement and reimbursement of expenses for A.F.'s home program.  Vol. 1, ALJ 1-6; Vol. 3, R-16 at AR 199.

Pursuant to the "stay put" rule, the 2008-09 IEP was not implemented and CCMC and the 2007-08 IEP continued to be the applicable placement and IEP for the 2008-09 school year. While A.F. remained at CCMC, Defendants continued to provide the home program at their own expense.  A.F. continued at CCMC until October 14, 2009, when the parties agreed to place A.F. at PCDI, a full-time ABA program for the education of autistic students in Princeton, New Jersey, where he currently remains.  Pl.'s br. at p. 3; Defs.' Br. at p. 12.

Importantly, neither party disputes that A.F. has made significant, meaningful educational progress from 2003 to 2007.  Pl.'s Br. at pg. 15; Defs.' Br. at pg. 12.  The District credits the CCMC program for A.F.'s progress based on: (1) a comparison of 2007 evaluations with 2003 evaluations; (2) CCMC teacher and therapist reports of A.F.'s "present levels of academic achievement and functional performance," (AR 43-44, 65-67,117-120); and (3) periodic progress reports from CCMC. AR 381; AR 760, 775.  In addition, the District relies on Wyers' testimony that A.F. made meaningful progress from 2004 to 2007.  Vol. 10, Tr. 96-108; Vol. 11, Tr. 30, 42 and 44.  A.F.'s parents, however, credit the ABA home program of 12 to 15 hours per week as a key factor in A.F.'s progress.  Although ALJ Kerins did not make a specific finding on this issue, she acknowledged that "both sides agree that A.F. had made significant progress by the end of the 2006-07 school year."  Vol. 1, ALJ 13.

## C. Procedural History

On June 19, 2008, A.F.'s parents filed a request for a hearing with the Office of Special Education (OSEP).   Vol. 1, ALJ 1-6.[8]   The petition sought the following relief: (1) continuation of A.F.'s placement at CCMC for the summer of 2008 and for the 2008-09 school year; (2) supplementation of the CCMC program with a home based ABA program of fifteen hours a week; and (3) reimbursement for the costs of a home program A.F.'s parents had provided during the 2007-08 school year to supplement his regular school day program.  Vol. 1, ALJ 3, 5.[9]  At that time, the District was proposing to transfer A.F. from his current educational placement at CCMC to an in-district placement called LARKS for the 2008-09 school year and opposed both the parents' proposed placement and request for reimbursement.  Subsequently, the parties entered mediation, but withdrew on October 2, 2008, and the matter was transmitted to the Office of Administrative Law for a hearing on October 7, 2008.  Vol. 1, ALJ 7.  Nine days of evidentiary hearings were held between November 19, 2008 and February 5, 2009.  Vol. 1, ALJ 11.  Additional conferences and hearings concerning exhibits, post hearing submissions and legal issues were held on April 3, May 11 and June 1, 2009.  Id.  Throughout the proceeding A.F. remained at CCMC under the "stay put" provision of federal and state law.  20 U.S.C.A. §1415(j); N.J.A.C. 6A:14A-2.7(u).[10]

---

[8]      The Administrative Record consists of: Vol. 1 (Pleadings and Decision of the ALJ), paginated ALJ 1 through ALJ 28 [cited as Vol. 1, ALJ (page number); Vols. 2 through 9 (Respondent- and Petitioner- exhibits from the administrative record below), paginated AR 1 through AR 1452 [cited e.g., as Vol. 2, R-2 at AR 3];Vols. 10 through 18, (Transcripts of the hearing below), [cited as Vol. 10, Tr. (page #)]

[9]      The petition also alleged that the District had violated the IDEA's procedural safeguards, but this claim was abandoned at the hearing.  Vol. 10, Tr. 9-14; Vol. 16, Tr. 146-8.

[10]      See Discussion, infra, at n. 13.

On March 4, 2009, after the close of evidence but before a decision issued, the District withdrew with prejudice its proposal to place A.F. in the LARKS program for the 2008-09 or 2009-10 school year.  Letter from David Carroll, Esq. dated March 4, 2009, Ex. C-1, Vol. 1, ALJ 27.  However, the District maintained its position that A.F.'s parents were not entitled to either reimbursement or prospective relief regarding a supplementary home program.  Id.  As such, the only issues left for decision by the ALJ were those relating to the reimbursement and continuation of the home program and the parents' request to be named as a "prevailing party" on the placement issue.  Vol. 1, ALJ 20-21.

In a decision dated July 16, 2009, ALJ Kerins ruled in favor of the parents and ordered the District to reimburse A.F.'s parents for two years of supplemental home instruction and also ordered the District to prospectively "reimburse the parents for the costs of the home program for school year 2009-2010 if A.F. remains in his CCMC placement."  Vol. 1, ALJ 11-26.

On August 24, 2009, the District filed the instant Complaint asking this Court to perform an independent review of the record and reverse the ALJ's decision, pursuant to 20 U.S.C.A. §1415(i)(2)(A).  Defendants filed an Answer to the District's Complaint and Counterclaim on November 25, 2009.  Thereafter, the parties filed cross-motions for summary judgment.

## II.   STANDARD OF REVIEW

Although framed as a motion for summary judgment, the instant matter is actually an appeal of the ALJ's ruling.  Indeed, "[w]here no new evidence has been presented to the Court, motions for summary judgment in an IDEA case are the procedural vehicle for asking the judge to decide the case based on the administrative record."  K.H. o/b/o K.H. v. N. Hunterdon-Voorhees Reg'l High Sch. Hunterdon Co., No. 05-4925, 2006 U.S. Dist. LEXIS 55522, *11

(D.N.J. Aug. 10, 2006) (citing M.A. v. Voorhees Twp. Bd. of Educ., 202 F. Supp. 2d 345, 359

(D.N.J. 2002)).  The standard of review in an IDEA case "differs from that governing the typical

review of summary judgment."  M.A. v. Voorhees Twp. Bd. of Educ., 202 F. Supp. 2d 345, 359

(D.N.J. 2002) (quoting Heather S. by Kathy S. v. State of Wisconsin, 125 F.3d 1045, 1052 (7th

Cir. 1997), aff'd, 65 Fed. Appx. 404 (3d Cir. 2003).  In an IDEA case, a court exercises a

"modified version of de novo review" over an administrative decision.  L.E. v. Ramsey Bd. of

Educ., 435 F.3d 384, 389 (3d Cir. 2006).  Under this standard, a court gives "due weight" to the

determinations of the administrative law judge.  Board of Educ. v. Rowley, 458 U.S. 176, 206,

(1982).  The purpose of the "due weight" standard is to prevent the courts from imposing their

own "view of preferable educational methods on the states."  Id.  However, a court is not required

to accept the findings of the administrative law judge, Carlisle Area School v. Scott P. By and

Through Bess P., 62 F.3d 520, 529 (3d Cir.1995), as long as a reviewing court "fully explain[s]

its reasons for departing from the state decision," S.H. v. State-Operated School Dist. of City of

Newark, 336 F.3d 260, 271 (3d Cir. 2003).

    "'[F]actual findings from the administrative proceedings are to be considered prima facie

correct,' and if the reviewing court does not adhere to those findings, it is 'obliged to explain

why.'"  D.S. v. Bayonne Bd. of Educ., 602 F.3d, 553 564 (3d Cir. 2010) (citing P.P. v. West

Chester Area Sch. Dist., 585 F.3d 727, 734 (3d Cir. 2009).  In particular, where "an ALJ has

heard live testimony and determined that one witness is more credible than another witness, her

determination is due special weight."  Id.  (citing Shore Reg'l High Sch. Bd. of Educ., 381 F.3d at

199).  "Specifically, this means that a District Court must accept the state agency's credibility

determinations 'unless the non-testimonial, extrinsic evidence in the record would *justify* a

13

contrary conclusion.'" Id. (citing Shore Reg'l High Sch. Bd. of Educ., 381 F.3d at 199 (quoting Carlisle Area Sch., 62 F.3d at 529) (emphasis in original)). "[T]he word 'justify' requires that the applicable standard of review be essentially the same as that a federal appellate court applies when reviewing a trial court's findings of fact." Id. (citing Shore Reg'l High Sch. Bd. of Educ., 381 F.3d at 199).

The Court's review over questions of law and the ALJ's application of legal precepts, however, is plenary. Carlisle, 62 F.3d at 528, n.3; D.B. v. Ocean Township Bd. of Educ., 985 F. Supp. 457, 500 (D.N.J. 1997); Bucks Cty. Dept. of Mental Health/Mental Retardation v. De Mora, 227 F. Supp.2d 426, 428 (E.D. Pa. 2002). See also Spectator Mgmt. Grp. v. N.L.R.B., 320 F.3d 385, 390 (3d Cir. 2003); Fotta v. Trs. of the UMW Health & Ret. Fund of 1974, 319 F.3d 612, 615-16 (3d Cir. 2003).

## III.   DISCUSSION

The instant appeal requires this Court to review the ALJ's decision finding that A.F.'s parents are entitled to reimbursement for the costs of the home tutoring program for the 2007-08 and 2008-09 school years and for the portion of the 2009-10 school year that A.F. was not placed in a full-time ABA program.[11]

Initially, the District argues that the ALJ committed legal error by not performing the correct analysis for a tuition reimbursement case, and instead, focusing on the supposed benefits of the home program rather than the appropriateness of the District's IEP. The District additionally contends that several of the ALJ's factual findings are unsupported by the record and, therefore, that this Court must make its own findings of fact. Finally, the District argues that

---

[11]     Reimbursement as to the 2009-10 school year is limited to the few months (July through September 2009) between ALJ Kerins' decision and A.F.'s placement at PCDI.

the IEP it offered A.F. was appropriate, and, therefore, that the Parents are not entitled to reimbursement for the supplemental home program.

### A.  Whether the ALJ applied the correct legal standard

In the underlying decision, ALJ Kerins found that "for the school years 2007-08 and 2008-09, the weight of the evidence shows that CCMC was not the appropriate placement for A.F.," and that a  "FAPE was not provided [to A.F.] by [the District] in those years." ALJ's Decision, Vol. 1, at 18, 20.  As a result, the ALJ ordered the District to reimburse A.F.'s parents for the costs of the supplemental  home program provided to A.F. in 2007-08 and 2008-09.  In this appeal, the District argues that the ALJ committed legal error in finding that the District did not provide an appropriate IEP because she did not perform the analysis required by the IDEA and case law.  Specifically, the District contends that rather than assessing the appropriateness of the District's IEP and CCMC placement, the ALJ instead focused "almost entirely on the supposed benefits of the home program."  Pl.'s Br. at pg. 26.  In response, the Parents allege that even if the ALJ did not clearly identify the applicable analysis, "the decision rendered was clearly a result of that process."  Defs. Reply Br. at 8.

The Supreme Court set forth the standard applicable to reimbursement cases under the IDEA in School Committee of Town of Burlington, Mass. v. Department of Educ. of Mass., 471 U.S. 359, 370 (1985) and Florence County School District Four v. Carter ex rel. Carter, 510 U.S. 7, 15 (1993).  "[U]nder Florence County 'a court may award a disabled student the cost of his private placement if (1) the court determines the student's IEP is inappropriate and (2) the student demonstrates that the private placement he seeks is proper.'"  Lauren W. v. DeFlaminis, 480 F.3d 259, 276 (3d Cir. 2007) (quoting Ridgewood Bd. of Educ. v. P.S., 172 F.3d 238, 247

15

(3d Cir. 1999)).  However, "the courts retain discretion to reduce the amount of a reimbursement award if the equities so warrant."  Forest Grove Sch. Dist. v. T.A., 129 S. Ct. 2484, 2496 (2009).

In the instant matter, the Court finds that the ALJ applied the proper standard for tuition reimbursement cases.  Specifically, in the underlying decision, the ALJ explained that  "[t]he weight of the evidence presented shows that FAPE was not provided by respondent [to A.F. for the school years 2007-08 and 2008-09]" and that the Parents "showed the appropriateness and the resulting accomplishments of the home program." ALJ's Decision at 20-21.  Thus, the plain language of the ALJ's decision demonstrates that the ALJ determined that A.F.'s IEP was inappropriate and that the supplemental home program  was proper; accordingly, the Court finds that the ALJ correctly applied the Florence analysis.

**B.  Whether the Parents are entitled to Reimbursement**

As discussed above, "a court may award a disabled student the cost of his private placement if (1) the court determines the student's IEP is inappropriate and (2) the student demonstrates that the private placement he seeks is proper."  Lauren W., 480 F.3d at 276 (quoting Ridgewood Bd. of Educ., 172 F.3d at 247).

**1.  Whether the District's IEPs were appropriate**

"When parents challenge [the adequacy of] a school's provision of a [free and appropriate public education] to a child, a reviewing court must (1) consider whether the school district complied with the IDEA's procedural requirements and (2) determine whether the educational program was 'reasonably calculated to enable the child to receive educational benefits.'" Mary Courtney T. v Sch. Dist., 575 F.3d 235, 249 (3d Cir. 2009) (quoting Rowley, 458 U.S. at 207). However, "a court should determine the appropriateness of an IEP as of the time it was made,

and should use evidence acquired subsequently to the creation of an IEP only to evaluate the reasonableness of the school district's decisions at the time that they were made." D.S., 602 F.3d at 565 (citing Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 762 (3d Cir. 1995)).  In the instant matter, the IDEA's procedural requirements are not at issue, and thus the Court's inquiry is limited to the second prong of Rowley.

Importantly, the Court notes that the IDEA does not require a school district to provide the best possible education for a child with a disability, merely an appropriate education. Rowley, 458 U.S. at 189; Polk v. Central Susquehanna Intermediate Unit, 853 F.2d 171, 178 (3d Cir. 1988) (discussing Rowley, 458 U.S. at 189).  To be appropriate under the IDEA, an IEP must provide "'meaningful' access to education and confer 'some educational benefit' upon the child for whom it is designed."  Ridgewood Bd. of Educ. v. P.S., 172 F.3d 238, 247 (3d Cir. 1999) (quoting Rowley, 458 U.S. at 192, 200).  However, the Third Circuit has held that the educational benefit must be more than "trivial," and must offer the potential for "significant learning" and "meaningful benefit."  Id.; see also Shore Reg'l High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 199 (3d Cir. 2004) (appropriate IEPs must be "'reasonably calculated' to enable the child to receive 'meaningful educational benefits' in light of the child's 'intellectual potential'").

"The issue of whether an IEP is appropriate is a question of fact."  State-Operated Sch. Dist. of Newark, 336 F.3d at 271 (citing Carlisle Area Sch., 62 F.3d at 526).  "A federal district court reviewing the administrative fact finder in the first instance is . . . required to defer to the ALJ's factual findings unless it can point to contrary nontestimonial extrinsic evidence on the record."  G.N. v. Bd. of Educ. of Livingston, Civ No. 05-3325, 2007 U.S. Dist. LEXIS 57081 at *15 (D.N.J. Aug. 6, 2007) (quoting State Operated Sch. Dist. of Newark, 336 F.3d at 270).

17

Therefore, the Court treats the ALJ's findings on the IEPs' appropriateness as prima facie

correct, D.S., 602 F.3d at 564, and reviews them under a clearly erroneous standard, Carlisle

Area Sch., 62 F.3d at 526 (citing Hassine v. Jeffes, 846 F.2d 169, 174 (3d Cir. 1988).

Because the educational placement provided by the District in the 2007-08 IEP differs

from the placement proposed in the 2008-09 IEP, the Court will address each school year

separately.

### a.  2007-2008 IEP

In the underlying decision, the ALJ found that CCMC was not the appropriate placement

for A.F. for the 2007-08 school year.  Vol. 1, ALJ 19.  In reaching this conclusion, the ALJ noted

that "[t]estimony from experts on both sides acknowledge that at least by the end of the 2006-07

school year, the curriculum was too easy for [A.F.] and the classroom setting may have actually

impeded his ability to learn and make progress.  In essence, [CCMC] had become a default

placement for A.F., rather than one in which he could make educational and life skill progress."

Id. [12]  In their motion, the District argues that the 2007-08 IEP was appropriate for two reasons:

first, the District argues that because A.F. made progress at CCMC from 2004 to 2007, such a

placement was again appropriate in 2007-08; in addition, the District argues that because Leslie

Wyers, the District's witness, testified that CCMC was appropriate, the 2007-08 IEP was

appropriate.   See Pl.'s Br. at pg. 32; see Vol. 11, Tr. 43-44.  The Court does not agree.

---

[12]The Court notes that the ALJ heard testimony from experts for both parties regarding the
appropriateness of the CCMC placement for the 2007-08 school year; thus, this Court must
accept the ALJ's credibility determinations pursuant to Carlisle Area Sch., 62 F.3d at 529.
Specifically, the ALJ's decision relies on the testimony of the District's witnesses, Leslie Wyers
and Dr. Thurman, and Defendants' expert Dr. Breslin in finding that the 2007-08 IEP was not
appropriate.

Initially, the Court notes that while A.F.'s past progress at CCMC may be relevant to the question of whether the 2007-08 IEP was reasonably calculated to confer some educational benefit, past progress is not dispositive.  See Thompson R2-J School District v. Luke P, 540 F.3d 1143, 1153 (10th Cir. 2008).   Indeed, while the evidence in the record demonstrates that A.F. had made progress at CCMC through 2007, the record just also demonstrates that, going forward, A.F. required a full-time ABA program in order to make meaningful educational progress, rather than a program that merely incorporated the principles of ABA.  For example, A.F.'s 2007-08 IEP expressly reflects the District's view that A.F. "thrives on teaching approaches that are well grounded in Applied Behavior Analysis" and that A.F. "benefits from private home ABA therapy by a trained educator three to four times per week."  AR 118.  Moreover, a letter from Wyers, A.F.'s Case Manager and a witness for the District, clearly states that "[t]he district agrees that [A.F.'s] educational program must be based in the principals of ABA."  AR 121 (Aug. 9, 2007 Letter from Leslie Wyers)(emphasis added).  Additionally, testimony from a number of the witnesses supports a finding that A.F. required an ABA program to make educational progress. See Vol. 11, Tr. 117:10-13 (Wyers agreeing that A.F.'s educational placement should be "grounded in the principals of [ABA]"); Vol. 12, Tr. 42:23-25 (Dr. Thurman testifying that after evaluating A.F. in 2003, he felt that A.F. was a "very good candidate" for, and recommended, a form of ABA called discrete trial training, noting that A.F. "could benefit from a very intensive one on one discrete trial sort of approach"); Vol. 13, Tr. 62:4-11, 188:5-189:1 (Dr. Breslin testifying that after her initial evaluation of A.F. in 2003, she "recommended a full time ABA program [for A.F.] … [with] primarily one to one instruction for most of the school day," and that A.F. continued to require a full-time one-to-one ABA program); Vol. 16, Tr. 118:11-12

19

(Dara Monsorno testifying that she "recommend[ed] an intensive one-to-one ABA-based intervention program" for A.F."); Vol. 17, 47:9-48:20 (Dr. Green recommending that A.F. be placed "full time in an applied behavior analysis program" and that "there aren't any other intervention approaches [at this time] that have proved effective for learners like [A.F.]"); Vol. 18, Tr. 34:15-16 (Carrie Magaletta testifying that A.F. required a very individualized teaching curriculum in order to make educational progress).  Moreover, all of A.F.'s IEPs during the relevant time period indicate A.F.'s need for an ABA program.  See Vol. 2, R-10 at AR 43, 47; R-11 at AR 83, 87; R-14 at AR 118, 120, 121, 143-44, 151; R-15 at AR 156; R-16 at AR 201. Despite the breadth of evidence demonstrating A.F.'s need for a full-time program grounded in the principles of ABA, such a program was not provided or available at CCMC, the placement offered in the 2007-2008 IEP.   Furthermore, while the 2007-08 IEP notes that although "CCMC will develop and implement programs involving the principles of Applied Behavioral Analysis," nothing in the record demonstrates that CCMC offered a full-time program based in ABA.  AR 51.  Indeed, Wyers admitted that CCMC is not an ABA program and that while CCMC  "use[d] the principles of ABA. . .it's not when you're looking for like 35 hours of direct ABA, that's not what CCMC describes themselves as doing."  Tr. 74:9-19.  Thus, the record supports the ALJ's finding that CCMC was not an appropriate placement for A.F. for the 2007-2008 school year.

Moreover, the Court finds that the District's next argument – that Leslie Wyers' testimony that the 2007-08 IEP placing A.F. at CCMC was designed to confer a meaningful educational benefit – also fails to justify a reversal of the ALJ's finding that the 2007-08 IEP was not appropriate.  Vol. 11, Tr. 43-44.  Specifically, as discussed above, the weight of the evidence

demonstrates that A.F. required an ABA program which was not offered in the 2007-08 IEP. Moreover, the Court notes that in addition to testifying that the 2007-08 IEP was appropriate, Wyers also testified that she believed that A.F.'s educational placement should be grounded in ABA.  Vol. 11, Tr. 117:10-13.   Indeed, Wyers' August 9, 2007 letter on behalf of the District states that the "district agrees that [A.F's] educational program must be based in the principles of ABA.  Thus, Wyers' own testimony concerning the IEP is, at best, contradictory.

Finally, in asking this Court to rely on Wyers' testimony in finding that the 2007-08 IEP was appropriate, the District is essentially asking this Court to second-guess the ALJ's credibility determinations concerning Wyers' testimony and to credit one portion of Wyers' testimony to the exclusion of the remaining testimony and other evidence in the record.  It is well-established that a court is "required to defer to the ALJ's factual findings unless it can point to contrary nontestimonial extrinsic evidence on the record."  State Operated Sch. Dist. of Newark, 336 F.3d at 270.   Here, the District has not pointed to any "contrary nontestimonial extrinsic evidence" that would justify the rejection of the ALJ's credibility determinations concerning Wyers or the ALJ's ultimate conclusion regarding the appropriateness of the 2007-08 IEP. For these reasons, the Court finds that the record supports the ALJ's conclusion that CCMC was not a proper placement for A.F. for the 2007-08 school year, and, therefore, that the District did not provide an appropriate education to A.F. during that time.

### b.  2008-2009 IEP

In the 2008-09 IEP, the District proposed to change A.F.'s educational placement from CCMC to its in-district LARKS program.  However, A.F.'s parents initiated a due process hearing challenging the LARKS placement and requesting reimbursement for the home program

for that year.  The parents' action invoked the IDEA's "stay put" provision.[13]  Thus, A.F. was

never actually placed in the LARKS program and, instead,  remained at CCMC for the 2008-09

school year, with his parents continuing to provide the supplemental home program at their own

expense.

Because A.F.'s 2008-09 IEP proposed placement in the in-district LARKS program,

much of the testimony presented at the administrative hearing concerned the appropriateness of

the LARKS program.  However, as discussed above, before the ALJ rendered a decision in the

underlying matter, the District withdrew, with prejudice, its proposal to place A.F. in the LARKS

program.[14]  See "Letter from David Carroll Esq. dated March 4, 2009," Vol. 1, ALJ 27.  Thus,

Defendants argue that by withdrawing the LARKS proposal, the District was admitting that the

LARKS program was not appropriate for A.F.  In response, the District, contends that its change

---

[13]   The stay-put provision of the IDEA mandates that "unless the State or local education agency
and the parents otherwise agree, [a] child shall remain in the then-current educational placement
of the child" during the pendency of due process proceeding.  20 U.S.C. §1415(j).  The Third
Circuit defines current educational placement as referring to "the operative placement actually
functioning at the time the dispute first arises."  Drinker by Drinker v. Colonial Sch. Dist., 78
F.3d 859, 867 (3d Cir. 1996) (quoting Thomas v. Cincinnati Bd. of Educ., 918 F.2d 618, 625-26
(6th Cir. 1990).  In cases where "the dispute arises before any IEP has been implemented, the
'current educational placement' will be the operative placement under which the child is actually
receiving instruction at the time the dispute arises."  Id.  Since A.F. was actually receiving
instruction at CCMC when his parents initiated the due process proceedings, the CCMC
placement in the 2007-08 IEP constitutes the "then current placement" under the IDEA's "stay
put" requirement.
[14] The District's motives for withdrawing its proposal for the LARKS program are unknown and
it is unclear exactly what educational placement it was proposing thereafter.  Under the "stay
put" provision, the district would only have been able to remove A.F. from CCMC while the IEP
dispute continued if A.F.'s parents agreed to a different placement.  See 20 U.S.C. § 1415 (j).
While it can be reasonably inferred that the district was consenting to the Parents' request to
continued placement at CCMC for the 2008-09 school year, there is no indication on the record
that this is the case.

of position regarding the LARKS placement was not tantamount to an admission that LARKS was inappropriate for A.F.  See Pl.'s Reply. Br. at pg. 9 n.1.  The Court does not agree.

Initially, the Court notes that the ALJ appears to have found that the District's sudden withdrawal of its proposal to place A.F. in the LARKS program constituted an admission that the LARKS program was not an appropriate placement.  See Vol. 1, ALJ 11 (stating that the District conceded the placement issue).  Because the record does not provide any explanation for the District's sudden withdrawal of its proposal for the LARKS program, the Court will accept the ALJ's implicit finding that the 2008-09 IEP, which designated the LARKS program for A.F.'s placement,  was not designed to provide A.F. with a meaningful opportunity for educational progress.  However, even if the Court were to assume that the IEP proposed to continue A.F.'s placement at CCMC for the 2008-09 school year, the Court finds that for the same reasons CCMC was not an appropriate placement for A.F. in 2007-08, CCMC was similarly inappropriate for A.F. in 2008-09.

### 2.  Whether the Parents' home program was proper

Under the second prong of Florence, the Court must also consider whether the supplemental home program provided by A.F.'s parents was appropriate; indeed, reimbursement is only warranted if the Court finds that the private placement is proper.  See Florence County, 510 U.S. at 15 (parents "are entitled to reimbursement only if a federal court concludes both that the public placement violated IDEA and the private school placement was proper under the Act.") (emphasis in original).  The Court notes that the standard a parental placement must meet in order to be "proper" is less strict than the standard used to evaluate whether a school district's IEP and placement is appropriate.  See Id. at 12-13.

23

In the underlying decision, the ALJ found that the supplemental home program provided by A.F.'s parents in 2007-08 and 2008-09 was proper.  Specifically, the ALJ found that the home program "was an intensive, one on one, ABA program … specifically geared to A.F," and that he "[made] progress attaining skills, including critical progress in speech skills, in the home program" in the 2007-08 and 2008-09 school years.  Vol. 1, ALJ 18-19.  The ALJ noted that the "evidence presented by [the Parents regarding the home program] was credible, articulate, detailed and buttressed by expert opinion and analysis, particularly that of Dr. Green."  Vol. 1, ALJ 19.  Specifically, the ALJ credited Dr. Green's testimony that the home program was "individualized for A.F. [where s]kills were taught systematically, with much repetition and reinforcement."  Vol. 1, ALJ 16.  Further, the ALJ found that "the record shows that [A.F.] had both the desire and the ability to learn, and importantly, the capacity to develop speech."  Vol. 1, ALJ 18.

Importantly, although the District suggests that the home program provided by the Parents was "minimal and ineffective," Pl's Br. at 27, the District has not pointed to any evidence in the record in support of this statement.  Indeed, the weight of the evidence is against the District's assertion, and further, the District does not appear to argue that the supplemental home program was not an intensive one-on-one ABA program; instead, the District appears to take issue with the number of hours provided by the therapists in the supplemental home program.   Pl's Br. at 28.  There is no dispute between the parties that an ABA program was appropriate for A.F. and that the home program provided such instruction.  Thus, the Court finds that the ALJ's conclusion as to the appropriateness of the home program is supported by the record and that

there is no basis to reject that finding.  Therefore, Defendants are entitled to reimbursement for the home program for the 2007-08 and 2008-09 school year.

### C.  Prospective Reimbursement for 2009-2010 School Year

In addition to ordering reimbursement for the 2007-08 and 2008-09 school years, the ALJ's July 16, 2009 decision ordered the District to reimburse A.F.'s parents for the costs of the home program should A.F. remain in the CCMC placement for the 2009-10 school year.  Vol. 1, ALJ 21.   It is well settled that, "'[w]hile parents who reject a proposed IEP bear the initial expenses of a unilateral placement, the school district's financial responsibility should begin when there is an administrative or judicial decision vindicating the parents' position.'"  P.R. v. Roxbury Twp. Bd. of Educ., Civ. No. 07-5935, 2008 U.S. Dist. LEXIS 8638 at *12 (D.N.J. Feb. 6, 2008) (quoting Susquenita School Dist., 96 F.3d at 86-87); see also Lauren W. v. Bd. of Educ., Civ. No. 02-4775, 2002 U.S. Dist. LEXIS 18303, at *12 (E.D. Pa. Sept. 12, 2002) ("[i]t is well established in this Circuit that 'once there is state agreement with respect to pendent placement, a fortiori, financial responsibility on the part of the local school district follows.' …  It is further well established that 'the policies underlying the IDEA and its administrative process favor imposing financial responsibility upon the local school district as soon as there has been an administrative panel or judicial decision establishing the pendent placement.'") (quoting Susquenita, 96 F.3d at 84).   As discussed above, A.F. remained at CCMC from July through September 2009 and the parties agreed to place A.F. at the Princeton Child Development Institute (PCDI), beginning October 14, 2009.  Indeed, neither party disputes that A.F. remained at CCMC from July through October 2009, and the District does not appear to contest its liability for the costs associated with this continued placement during this period.  Thus, the Court finds

that the District is liable for the costs of the home program from July 16, 2009, the date of the

ALJ's decision, until October 14, 2009, when A.F. began at PCDI.

Moreover, to the extent that Defendants seek reimbursement for the home program after

October 2009, the ALJ's decision expressly conditioned the District's continued responsibility

for financing the home program on A.F.'s remaining at CCMC.  Indeed, 20 U.S.C. §1415(j)

provides that the current educational placement may be changed during the pendency of a due

process proceeding if the "state or local educational agency and the parents otherwise agree" to a

different placement.  Here, A.F.'s parents and the District agreed on a placement at PCDI for

A.F. beginning October 14, 2009.  There is no evidence in the record to suggest that continuation

of the home program was included in this agreement.  Therefore, the Court finds that the

District's obligation to finance the home program ended when the parties located an alternative,

mutually agreeable placement for A.F. in October 2009.  Accordingly, the Court will affirm the

ALJ's order that the District continue to reimburse A.F.'s parents for the costs of the home

program for the 2009-10 school year while A.F. remained at CCMC, from July 16, 2009 until

October 14, 2009.

## IV. CONCLUSION

For the reasons set forth above, the Court will affirm the ALJ's July 16, 2009 decision.

Thus, the District's Motion for Summary Judgment is DENIED and the Parents' Motion for

Summary Judgment is GRANTED.   Moreover, the Court notes that the Counterclaim also

requested relief to grant the Parents prevailing party status and fees and costs incurred in

connection  with the Due Process proceeding and this matter.  As set forth in the accompanying

ORDER, the parties are hereby directed to contact the Magistrate Judge to set up a status

conference regarding these issues.


Dated: March 4, 2011                                    /s/ Freda L. Wolfson

                                                        Freda L. Wolfson, U.S.D.J.